[605 NYS2d 742]

Martin A. et al., Respondents, v George Gross et al., Appellants.

First Department, December 23, 1993

### APPEARANCES OF COUNSEL

*John Hogrogian* of counsel, New York City *(Pamela Seider Dolgow* and *Grace Goodman* with him on the brief; *O. Peter Sherwood, Corporation Counsel* of New York City, attorney), for municipal appellants.

*Robin L. Dahlberg* of counsel, New York City *(David W. Rivkin, Steven P. Heineman* and *Marcia Robinson Lowry* with her on the brief; *Debevoise & Plimpton* and *American Civil Liberties Union,* attorneys), for Martin A. and others, respondents.

### OPINION OF THE COURT

Ross, J.

This action was commenced in 1985 by two families, then designated families A. and B., on behalf of themselves and a putative class of families who have been or will be the subject of a report of suspected child abuse and maltreatment, or who have or will be identified as being at risk of foster care placement. The complaint was subsequently amended to increase the number of named plaintiffs to nine families who have been designated as families A. through I. This appeal is the third appeal before this Court in this case and primarily concerns the family designated as family G. However, the issue presented impacts upon all of the other plaintiffs in this litigation and will certainly have implications beyond this case.

The issue we are called upon to decide is whether the Supreme Court properly exercised its discretion in denying the municipal defendants' motion for a protective order seeking to prevent discovery of an internal report of the New York City Human Resources Administration's (HRA) Child Fatality Review Panel relative to the death of Alan G., the sibling of the four G. family plaintiffs. The municipal defendants' motion was denied by the IAS Court on the ground that the plaintiffs' nonmonetary relief, which was characterized by that court as the eradication or reduction of systemic neglect of children, and families, by the Child Welfare Administration (CWA), so outweighs the municipal defendants' interest in maintaining the report's confidentiality, as to preclude the application of the public interest privilege to the report. We disagree, and for the reasons that follow hold that it was an improvident exercise of the IAS Court's discretion to deny the motion for a protective order.

On the first appeal in this matter we stated that "plaintiffs essentially claim that the various governmental defendants failed to establish plans to provide preventive services to families whose children were determined to be at risk of foster care, in violation of the Child Welfare Reform Act of 1979 (Social Services Law § 409 *et seq.)* and the regulations promulgated thereunder." *(Martin A. v Gross,* 153 AD2d 812, 813.) The original plaintiffs, designated then as the Martin A. plaintiffs and the Cosentino plaintiffs, represented two distinct groups and presented closely related, but discrete claims.

The Martin A. plaintiffs were several families whose children were in foster care or were determined by the defendant social services agencies to be in jeopardy of foster care due to a variety of severe tragic personal crises. These plaintiffs essentially sought to compel the defendants to comply with State and Federal law by providing them with preventive and protective services reasonably calculated to preserve family integrity. They alleged that the defendants knew their children were in foster care, but that systemic problems existed in the social services agencies, which resulted in defendants' failure to properly assess the needs of these families and to provide protective and preventive services as required by law.

The Cosentino plaintiffs consisted of homeless families whose children were placed in foster care as a result of their families' lack of housing. These plaintiffs claimed that it was defendants' policy and practice to encourage homeless or

inadequately sheltered families to place and keep their children in voluntary foster care for extended periods of time. They sought to enjoin the placement or retention of children in foster care unless the defendants first (1) determine whether provision of housing-related services can avert or shorten foster care; (2) inform affected families of the availability of housing-related services; and (3) develop and implement meaningful case plans to ensure the provision of preventive housing services. These plaintiffs specifically sought to enjoin the State from imposing a 90-day limit on emergency shelter as a preventive housing service.

In our order entered September 28, 1989 *(supra)*, we affirmed the order of the IAS Court (Wilk, J.), entered April 30, 1987 (138 Misc 2d 212), which, *inter alia*, granted both the Martin A. and Cosentino plaintiffs' motions for a preliminary injunction directing the municipal defendants to develop a plan to meet the obligation to provide preventive services, and enjoining the State from imposing a 90-day limit on emergency shelter as a preventive service. We found the injunctions to be relatively limited in scope and to protect the plaintiffs involved from the irreparable injury of needless separation of families, while giving the social service agencies latitude to use their administrative expertise and discretion to design a plan which they deemed appropriate.

At the time of the second appeal to this Court the plaintiffs consisted of six families (then designated A. through F.). At that time, plaintiffs' motion for class certification was held in abeyance by the IAS Court. In our order entered March 14, 1991, we reversed the order of the IAS Court (Wilk, J.), entered June 8, 1990, which denied the municipal defendants' motion for a protective order regarding the plaintiffs' request for production of documents. It was concluded that the request, which sought production of a massive number of documents relating to the City's system-wide planning and provision of preventive services, was overbroad and sought system-wide policies, procedures and statistics where there has been no class certification. Further, it was held that the motion did not seek material relevant to the class certification motion held in abeyance by the IAS Court *(Martin A. v Gross,* 171 AD2d 491).

The G. family, which consists of the four surviving siblings of Alan G., a five-year-old child who was tragically beaten to death by his parents on March 5, 1990, was granted permission to intervene by the IAS Court (Wilk, J.), by order entered

on or about February 19, 1992. Each of the four children reside in separate foster homes. Their complaint joined, and incorporated by reference, the first eight causes of action and all of the amendments to the first and second amended complaints previously filed.

The G. family and their guardian ad litem alleged that the children were the subject of more than 10 abuse reports filed with the Child Welfare Administration between 1983 and March 1990. They alleged that the municipal defendants failed to investigate reports within the time periods and in the manner required by law and failed to provide them with services necessary to protect them from harm. In addition to the equitable relief sought by the prior plaintiffs, the G. family plaintiffs set out five additional causes of action, alleging, *inter alia,* violations of various provisions of the Social Services Law and 42 USC § 1983. Each of these additional causes of action sought monetary relief of $3,000,000 to compensate the infant plaintiffs for, *inter alia,* severe permanent personal injuries and "emotional and psychological damages", which resulted from their maltreatment and the death of plaintiffs' deceased Alan G.

"PLAINTIFFS' SEVENTH REQUEST FOR DOCUMENTS" dated February 12, 1992, served ostensibly on behalf of all plaintiffs, requested production of the "HRA's Fatality Review Panel's report on the death of Alan G." The municipal defendants opposed and moved pursuant to CPLR 3103 for a protective order vacating the demand. Defendants invoked the "public interest privilege", which "attaches to 'confidential communications between public officers, and to public officers, in the performance of their duties, where the public interest requires that such confidential communications or the sources should not be divulged' " *(Cirale v 80 Pine St. Corp.,* 35 NY2d 113, 117).

Prior to the demand for the report here in question, the G. family requested and received production of the entire 1,000-page case record of the G. family. The record contained, *inter alia,* copies of all reports of suspected abuse or neglect made to the State-wide central register with respect to this family, as well as the history notes by caseworkers showing what response was made to each report by the HRA and other agencies. Furthermore, caseworkers were made available to the plaintiffs' counsel for depositions. In short, it is apparent that, as the municipal defendants maintain, plaintiffs had

access to all of the information that was reviewed by the Panel concerning the death of Alan G.

In opposition to defendants' motion, counsel for the G. family maintained that the G. family had reason to believe that there were reports of abuse and neglect which were not reflected in the case record but which may have been accounted for in the report. It was further averred that, "[i]n addition, the case records previously produced to plaintiffs contain only information recorded contemporaneously in regard to the G family. Additional information, essential to the prosecution of the claims of the G children and the estate of Alan G, may have come to light as a result of the interviews conducted in connection with the Panel Report". Plaintiffs also maintained that excerpts of the Panel's report were made available to the print and television media and that caseworkers deposed prior to the motion were unable to recall the details of their involvement with the G. family.

On appeal plaintiffs rely principally, though not exclusively on, (1) the argument that the report has already been made public and is no longer confidential and; (2) the contention that the Panel's own ineffectiveness makes any argument that release of the report will impede its functioning by inhibiting caseworkers' and other agency employees' openness before the Panel meritless. Thus plaintiffs maintain that the interests of the G. children, in helping to eradicate systemic neglect in the child protective system and in their claims for damages, far outweigh the defendants' interest in maintaining the confidentiality of their internal review process.

The record demonstrates that the HRA Child Fatality Review Panel was established sometime in 1985. The general function of the Panel, as stated by its Executive Deputy Administrator for External Affairs is to "assess the activities of all components of the child welfare system, review the appropriateness and adequacy of HRA's child protective and legal activities, and the activities of other involved agencies and, based on case findings, to recommend appropriate corrective actions to reduce the level of risk to children".

The Panel reviews those cases in which a child's death is reported to the State-wide central register of child abuse and maltreatment (SCR), and in which the child's family was "known" to the Child Welfare Administration prior to the filing of the fatality report. According to the Executive Deputy Administrator, a family is considered known to the CWA if

there was an earlier report to the SCR of abuse or neglect and there was some credible evidence to support the allegation made in the report, or if the family was receiving services from the CWA at the time of the fatality report. The Panel's review is based on the following: (i) CWA's memorandum of the contents of the complete case record, and of interviews with caseworkers and supervisors; (ii) CWA's internal corrective action memorandum which reviews the case for practice and procedure compliance; and (iii) HRA's Office of Legal Affairs' memorandum outlining CWA's contacts with that office and the courts. The Panel may also request additional documentation as needed.

The Panel publishes an annual report in which individual case findings are discussed, corrective actions recommended and CWA's actions in response are documented. The annual report preserves the confidentiality of all involved by omitting information needed to identify individual cases. Caseworkers interviewed in connection with the review of individual cases are assured that the information they provide will be kept confidential. The Executive Deputy Administrator stated, and it is the position of the municipal defendants, that caseworkers interviewed by the Panel would be discouraged from being completely free in their statements to the Panel if they knew that the Panel's report in individual cases was discoverable in litigation.

The Executive Deputy Administrator, in her affidavit, listed some of the various improvements in the child welfare system that the Panel's work has fostered. Among the improvements detailed were, the development of a pilot project with the Health and Hospitals Corporation for "high-risk" infants; entry into a memorandum of understanding with the Board of Education providing for clearer cooperation in cases of educational neglect; the finalization of the CWA's Family Rehabilitation Program; and the over-all enhancement of investigations, service delivery and monitoring in cases involving substance abuse and training on issues of domestic violence.

The public interest privilege, developed as part of this State's decisional law, provides generally that " 'official information' in the hands of governmental agencies has been deemed in certain contexts, privileged" (*Cirale v 80 Pine St. Corp.*, 35 NY2d 113, 117; *supra*). As stated above, the privilege attaches to confidential communications between public officers, and to public officers, in the performance of their duties, where the public interest requires that such confidential com-

munications or the sources thereof should not be divulged. *(Supra.)* It has been stated that the "hallmark of this privilege is that it is applicable when the public interest would be harmed if the material were to lose its cloak of confidentiality". *(Supra,* at 117.) The "[p]ublic interest is a flexible term and what constitutes sufficient potential harm to the public interest so as to render the privilege operable must of necessity be determined on the facts of each case" *(Cirale v 80 Pine St. Corp.,* 35 NY2d, *supra,* at 118-119).

The balancing of interests that a court asked to apply the privilege must engage in has been described in various ways. In *Cirale v 80 Pine St. Corp. (supra,* at 118), where plaintiffs in a wrongful death action sought discovery of various documents held by a Board of Inquiry convened to study the steam pipe explosion at 80 Pine Street in Manhattan and to formulate remedial legislation or regulations to prevent such occurrences in the future, the Court stated that: "While some commentators have argued that the privilege is qualified and requires a balancing of the needs of the litigants against the potential harm to the public interest that may result from disclosure (see 42 Fordham L. Rev. 807; 107 U. of Pa. L. Rev. 166), these, in reality, are two sides of the same coin. Public interest encompasses not only the needs of the government, but also the societal interests in redressing private wrongs and arriving at a just result in private litigation. Thus, the balancing that is required goes to the determination of the harm to the overall public interest. Once it is shown that disclosure would be more harmful to the interests of the government than the interests of the party seeking the information, the overall public interest on balance would be better served by nondisclosure. While the need of a litigant for the information would present a strong argument for disclosure, the court should balance such need against the government's duty to inquire into and ascertain the facts of a serious accident for the purposes of taking steps to prevent similar occurrences in the future."

*One Beekman Place v City of New York* (169 AD2d 492) was a zoning case in which the plaintiffs, the corporate owner and tenant-shareholders of a cooperative apartment building in Manhattan, sought discovery of documents prepared by the staff of the Department of City Planning containing analyses, opinions and recommendations. This Court reversed the Supreme Court order, which directed the City to disclose the documents, and described the required analysis succinctly,

stating that "[i]n determining whether the public interest privilege is applicable in a given set of circumstances, a court must weigh the encouragement of candor in the development of policy against the degree to which the public interest may be served by disclosing information which elucidates the governmental action taken" *(supra,* at 493).

The competing interests of the G. family and the municipal defendants in the present case are both compelling. In at least one respect they coincide. The G. family seeks to accomplish the broader goal shared by all of the plaintiffs of improving the child welfare system. However, the G. family also seeks to accomplish the goal of their separate monetary claims, each of which seek $3,000,000 in damages from the municipal defendants. The municipal defendants share, with the G. family and the other plaintiffs, the goal of improving the child welfare system and reducing the number of child fatalities in New York City. Inasmuch as the plaintiffs have received nearly all of the information used by the Panel in formulating the child fatality report on the death of Alan G. and have access to the annual report published by the Panel, it is evident that the broader goal shared by both the plaintiffs and the defendants in this action is more likely to be accomplished if the Panel remains free to conduct a frank analysis of child fatalities in families "known" to the CWA. It is without question that caseworkers and others interviewed by the Panel will be less candid in their statements if the assurance of confidentiality were removed. Moreover, individual members of the Panel itself may be less free with critical comment if the report is made subject to disclosure. There would be an obvious "chilling effect" upon the Panel.

The IAS Court concluded essentially that the report itself is representative of the systemic problems that exist in the system stating that it was "impressed by its inadequacy" and that for the purposes of plaintiffs' "non-monetary relief", "the Panel Report will be more useful not for what it says but for what it fails to say, and for what that failure says about those responsible for implementing and monitoring the City's foster care system". We disagree with the IAS Court's conclusion in this matter. It appears that the IAS Court placed little emphasis on the G. family plaintiffs' private claims for monetary damages. It is significant the plaintiffs concede that the report may be relevant to their personal injury claims. Moreover, it is evident that the IAS Court's conclusions regarding disclo-

sure of the report are based primarily on its dissatisfaction with the report itself.

Given that the entire G. family case record has already been disclosed by the municipal defendants, it is clear that granting the disclosure sought will inhibit the effectiveness of future self-study by the defendants and will primarily further the claims for monetary relief made by these particular plaintiffs.* The shared goal of improving the child welfare system will not be advanced if the municipal defendants' own steps toward that goal are frustrated. As stated *supra,* this matter has implications which reach beyond the legitimate private interests of the G. family plaintiffs. The broader goal shared by all of the plaintiffs and the municipal defendants alike outweighs the distinct interests of one set of plaintiffs.

Plaintiffs' argument that the Panel itself is ineffective and that the maintenance of the integrity of its review procedures does not compare to the purposes to be served by disclosure of this report and others like it echoes the IAS Court's conclusions. The argument is based on plaintiffs' conclusions that the Panel's annual reports make the same or similar recommendations year after year and that those findings are apparently ignored by the CWA. While plaintiffs' conclusions find some support in the record, there is also significant evidence that the Panel's work has resulted in positive changes. Clearly the improvement of the CWA's responsiveness to the Panel's recommendations, rather than impairing the Panel's ability to review the performance of the CWA, is a more desirable solution. Again, while the plaintiffs maintain that the disclosure of the report here in question and others like it will advance the over-all goal of improving foster care services and eliminating the systemic neglect, we conclude that the opposite is more likely to occur.

We are not insensitive to the psychological, emotional and physical trauma endured by children, such as the G. family plaintiffs, who have been subjected to chronic abuse and neglect. The improvement of the child welfare system in the City of New York is a moral and social imperative. While monetary compensation of individual plaintiffs may be appro-

---

* In referring to the self-critical nature of the report we do not rely on or expressly recognize the "critical self-analysis privilege" cogently discussed in *Lamitie v Emerson Elec. Co.* (142 AD2d 293, 298, *lv dismissed* 74 NY2d 650). We do, however, acknowledge that the self-critical nature of the report is, in the context of this case, fundamental to the achievement of the goal shared by both plaintiffs and defendants herein.

priate, it cannot be a predominant factor here, since nondisclosure of the Panel's fatality report on the death of Alan G. will advance the broader goal of this case, and will not impede the G. family's claims for damages. We conclude, therefore, that the public interest will be better served by maintaining the confidentiality of the Panel's conclusions in the report.

While the G. family plaintiffs maintain that confidentiality of the report was destroyed by the publication of excerpts by the media, we disagree. The record makes clear that while excerpts from the report were disseminated to the media, the remainder of the report was not made known to the general public. It is also clear that the HRA did not itself release the report. Such unauthorized disclosure does not operate as a waiver of the municipal defendants' claim of confidentiality (*see, Matter of Mitzner v Sobol,* 173 AD2d 1064, 1066; *see also, Matter of Scaccia v New York State Div. of State Police,* 138 AD2d 50, 53). Further, the confidential interviews with caseworkers had not been published in the media.

The G. family plaintiffs also contend that Social Services Law § 422 (4) (A) (d) provides them with a statutory right to the Panel's report. Section 422 of the Social Services Law establishes the State-wide central register of child abuse and maltreatment reports. Subdivision (4) (A) provides that "[r]eports" made pursuant to title 6 of article 6 of the Social Services Law as well as "any other information obtained, reports written or photographs taken concerning such reports in the possession of the department, local departments, or the commission on quality of care for the mentally disabled, shall be confidential and shall only be made available to * * * (d) any person who is the subject of the report or other persons named in the report". Given the context of the statute, it is clear that the Child Fatality Review Panel report here in question is not within the purview of the disclosure provision of section 422, even though the information put before the Panel, which has already been disclosed to plaintiffs, is covered by the section. The privilege which protects the Panel's report from disclosure is the public interest privilege as set forth in *Cirale v 80 Pine St. Corp. (supra).*

Accordingly, the order of Supreme Court, New York County (Elliott Wilk, J.), entered January 22, 1993, which, *inter alia,* denied the municipal defendants' motion for a protective order vacating plaintiffs' discovery request, is reversed, on the law and the facts and in the exercise of discretion, and the motion is granted, without costs.

SULLIVAN, J. P., KASSAL, RUBIN and NARDELLI, JJ., concur.

Order, Supreme Court, New York County, entered January 22, 1993, which, *inter alia,* denied the municipal defendants' motion for a protective order vacating plaintiffs' discovery request, reversed, on the law and the facts and in the exercise of discretion, without costs, and the motion granted.