*4
 
 OPINION OF THE COURT
 

 Bellacosa, J.
 

 The civil lawsuits assembled within this consolidated discovery dispute stem from negligence claims of individuals and businesses that allege various injuries and damages as a result of the World Trade Center (WTC) bombing in 1993. At issue are plaintiffs’ pretrial efforts to obtain WTC building security plans and documents from the Port Authority (PA). Defendant PA opposes this document turnover on grounds of public safety. It asserts New York’s public interest privilege exception to this State’s liberal discovery rules and tradition.
 

 The WTC, at the foot of Manhattan Island, is comprised of a multibuilding office and commerbial complex located on a 16-acre site that includes New York City’s largest public plaza. As is widely known, a bomb exploded in the B-2 level of the public parking garage located beneath the Concourse of the WTC on February 26, 1993. The explosion killed six people, injured many others, and disrupted numerous businesses and lives. Four terrorists were convicted in Federal court of engaging in a conspiracy that led to the placement and detonation of the bomb. Plaintiffs contend that the PA, which still owns the WTC, negligently failed to implement security measures that would have either kept the bomb out of the garage or mitigated the ensuing injuries, damages and destruction.
 

 We hold that the PA is not required, as a matter of law, to disclose the WTC security-related materials at issue. Rather, an in camera assessment of the disputed documents is necessary to weigh whether the particular, requested data are shielded by a public interest privilege against disclosure of confidential governmental communications.
 

 
 *5
 
 I. The Parties
 

 A. Defendant-Appellant Port Authority and Its Office for Special Planning Report
 

 In 1921, the PA was created by bi-State legislation designed to promote cooperation between New York and New Jersey in developing the terminal, transportation and other facilities of commerce in, about and through the Port of New York for the economic benefit of the Nation, as well as of New York and New Jersey
 
 (see,
 
 McKinney’s Uncons Laws of NY §§ 6401-6423; L 1921, ch 154, § 1). Currently, the PA owns, operates or oversees several major facilities, including airports, interstate bridges and tunnels, as well as the WTC.
 

 The WTC was itself created through legislation intended to encourage New York and New Jersey to “preserve and protect the position of the port of New York as the nation’s leading gateway for world commerce”
 
 (see,
 
 McKinney’s Uncons Laws of NY § 6601 [5]; L 1962, ch 209, § 1). The WTC includes all buildings, structures, improvements and areas constituting a facility of commerce notwithstanding that portions of them “may not be devoted to purposes of the port development project other than the production of incidental revenue available for the expenses of all or part of the port development project”
 
 (see,
 
 McKinney’s Uncons Laws of NY § 6602). The defining concept encompasses the “unified plan to aid in the preservation of[ ] the economic well-being of the northern New Jersey-New York metropolitan area and
 
 is found and determined to be in the public
 
 interest” (McKinney’s Uncons Laws of NY § 6601 [9] [emphasis added]). Indeed, the WTC is “in all respects for the benefit of the people of the states of New York and New Jersey”, and, in so effectuating the project and carrying out the relevant provisions of the law, the PA “shall be regarded as
 
 performing an essential governmental function”
 
 (McKinney’s Uncons Laws of NY § 6610 [emphasis added]).
 

 In 1984, terrorist activities occurring in other areas of the world spurred the PA to create the Office for Special Planning (OSP) to address exposure to terrorist acts in all PA-owned facilities. OSP’s mission was to conduct an extensive review to address vulnerabilities, identify alternatives and solutions, present recommendations to each facility’s management, and obtain a response from each facility to coordinate with the PA’s Director of Public Safety. OSP’s work generated a document in 1985, entitled “Counter-Terrorism Perspectives: The World
 
 *6
 
 Trade Center” (OSP Report). The OSP Report was submitted to the Executive Director of the PA, the Director of Public Safety of the PA, the Superintendent of the PA Police, and the Director of the World Trade Department.
 

 After the 1993 bombing, portions of the OSP Report were discussed at public hearings conducted by the New York State Senate Committee on Investigations, Taxation and Government Operations. These hearings resulted in a Senate Committee Report, dated August 3, 1993, which found, among other things: “The 1985 OSP report listed a series of possible methods of attacking the World Trade Center. The specifics of the February 26, 1993 bombing at the World Trade Center garage were almost identical to those envisioned in the report.” The Senate hearings and report also revealed that numerous governmental security agencies had concurred with the findings of the OSP Report and that the PA had engaged private consulting firms to review the report. These firms also issued summary reports that concurred with the OSP’s findings and recommendations.
 

 B. Plaintiffs’ Steering Committee
 

 Plaintiffs are represented by a Steering Committee, which was created by a judicial consolidation order dated July 29, 1994. It joins more than 175 cases for trial, discovery and motions. However, at a point prior to the creation of the Steering Committee and the joinder of the various cases, discovery issues arose in two of the discrete actions.
 

 In August 1993, Phoenix Assurance Company of New York sought subrogation against the PA to recover money it paid to one of its policyholders for property damage claims
 
 (Phoenix Assur. Co. v Port Auth.,
 
 Sup Ct, NY County, No. 120788/93). In December 1993, Phoenix demanded production of the OSP Report, reports prepared by the PA’s security consultants, and related data. The PA turned over some material, but objected to disclosure of 68 documents. (Plaintiffs refer to 62 disputed documents, though the PA considers certain pages of multiple-page documents as constituting separate documents, yielding a count of 68 documents.) The PA sought to shield the OSP Report and documents related to it, including documents categorized as “security audit [s]” that identify possible vulnerabilities of security systems at the WTC. Phoenix then moved to compel production of the withheld documents.
 

 In April 1994, plaintiffs in another case
 
 (Dean Witter Reynolds v Port Auth.,
 
 Sup Ct, NY County, No. 106016/94) also
 
 *7
 
 moved to compel nonparty security consultants to comply with subpoenas duces tecum, by producing particular documents within the pending discovery motion in the
 
 Phoenix
 
 case. The documents encompassed within these two motions are the core focus of this appeal by the PA from an Appellate Division order that essentially directed a complete turnover to plaintiffs. This disclosure was qualified only by a confidentiality agreement that was to be negotiated on the remittal at the nisi prius court level.
 

 II. Procedural History
 

 After the Steering Committee was created, all parties agreed to deem the two pending discovery applications as a consolidated motion by all parties against the PA. In 1995, Supreme Court formalized this consolidation and ordered delivery of the disputed documents to the court. Pursuant to stipulation, an initial in camera inspection was referred to a Special Master, who issued a report on December 12, 1996. The Master detailed findings in conjunction with the PA’s assertions of the public interest privilege regarding specified documents and data.
 

 Supreme Court then conducted its own in camera review of materials that the Special Master had not reviewed. In 1997, Supreme Court adopted, with some revisions, the Special Master’s Report. All further discovery issues were referred to a Special Referee who issued two clarifying orders. The orders essentially withheld from disclosure certain documents or parts based on the public interest privilege, withheld material that was deemed irrelevant to security matters beneath the Concourse level of the World Trade Center, and withheld one document subject to the attorney-client privilege.
 

 The contending parties appealed to the Appellate Division. The PA primarily sought to have all documents withheld pursuant to the public interest privilege rooted in the policy incentive for complete candor surrounding confidential government consultation dealing with security analysis. The PA also sought at least to extend Supreme Court’s public interest privilege application and relevancy determinations to more documents. Plaintiffs cross-appealed and challenged Supreme Court’s application of the public interest privilege at all, and its particularized relevancy determinations.
 

 The Appellate Division ruled in favor of plaintiffs. It held that the PA’s function, in its role as owner of the WTC, is indistinguishable from that of any other private landlord. It thus rejected the public interest privilege for this case, as a
 
 *8
 
 matter of law. It also determined that the documents objected to on relevancy grounds should be disclosed. Its modification order then remitted the matter to the IAS Court for the fashioning of a confidentiality agreement with regard to disclosure of the disputed documents to the Steering Committee lawyers.
 

 The Appellate Division granted leave to the PA to appeal to this Court. We answer that court’s certified question in the negative, and conclude that the public interest privilege is not precluded as a matter of law.
 

 III. Analysis
 

 A public interest privilege inheres in certain official confidential information in the care and custody of governmental entities. This privilege permits appropriate parties to protect information from ordinary disclosure, as an exception to liberal discovery rubrics
 
 (see, Cirale v 80 Pine St. Corp.,
 
 35 NY2d 113 [1974]). Specifically, the privilege envelops “ ‘confidential communications between public officers, and to public officers, in the performance of their duties, where the public interest requires that such confidential communications or the sources should not be divulged’”
 
 (id.,
 
 at 117 [citations omitted]). The justification for the privilege is that the public interest might otherwise be harmed if extremely sensitive material were to lose this special shield of confidentiality
 
 (see, id.,
 
 at 117).
 

 Contrary to the sweeping assertions of the respective parties, the privilege is neither absolute as the PA wishes, nor is it so easily evaded as plaintiffs’ categorical incantations would effect. The PA is not “just another landlord.” Whether the privilege attaches in a particular setting is a fact-specific determination for a fact-discretion weighing court, operating in camera, if necessary. The public interest, and what adds up to sufficient potential harm to it, are necessarily and inherently flexible concepts
 
 (see, id.,
 
 at 118-119). Entitlement to the privilege requires, therefore, that an agency claiming some special governmental-public interest “cone of silence” demonstrate the specific public interest that would be jeopardized by an otherwise customary exchange of information
 
 (see, id.,
 
 at 119). After all, the public interest correspondingly encompasses societal interests in redressing private wrongs, like those alleged by plaintiffs, and allows for the fair adjudication of private litigation
 
 (see, id.,
 
 at 118). These competing objectives bespeak the weighing and proportionality of redress and access to public, though confidential, information. However, “[o]nce it
 
 *9
 
 is shown that disclosure would be more harmful to the interests of the government than [nondisclosure would be to] the interests of the party seeking the information, the overall public interest on balance would then be better served by nondisclosure”
 
 (id.,
 
 at 118).
 

 Notably, a mere showing by a private litigant in a civil case that information sought would be helpful to secure “useful testimony” is not enough to override a demonstrated or manifest potential harm to the public good
 
 (see, id.,
 
 at 118). Rather, a court must calibrate the need of a litigant for information with the government’s duty to try to prevent similar occurrences and to maintain the public peace and welfare
 
 (see, id.,
 
 at 118).
 

 Since
 
 Cirale,
 
 this balancing of interests has been described in various ways and can include the weighing of “ ‘the encouragement of candor in the development of policy against the degree to which the public interest may be served by disclosing information which elucidates the governmental action taken’ ”
 
 (see, Martin A. v Gross,
 
 194 AD2d 195, 202-203, quoting
 
 One Beekman Place v City of New York,
 
 169 AD2d 492, 493;
 
 see also, McDermott v Lippman,
 
 Sup Ct, NY County, NYLJ, Jan. 4, 1994, at 35, col 3 [applying a statutory Freedom of Information Law exemption to security analyses regarding upstate New York trial courthouses because there was “a possibility that the release of the security surveys conducted by the respondents * * * would endanger the lives or safety of the people working in and/or visiting the (buildings)”]). The calibration can also take into account the extent to which pertinent information is available to plaintiffs from other public sources, and the extent to which any overarching goals shared by the parties may be accomplished by nondisclosure
 
 (see, Martin A. v Gross, supra; One Beekman Place v City of New York, supra).
 

 Due to the fact-specific nature of this inquiry and the required balancing, we conclude that the Appellate Division’s matter-of-law rejection of the public interest privilege in the face of the legitimate concerns of the PA is too sweeping. Under the circumstances of this case, further judicial in camera review of the sought-after documents, not unlike the perspicacious gauging conducted at the Supreme Court level with the expert aid of the Special Master, is necessary to determine the extent to which the public interest privilege may protect the concerns that the PA bears under its bi-State enabling legislation and statutory responsibilities.
 

 
 *10
 
 The public interest privilege adheres to the disputed documents here on a presumptive basis since the PA “is and of necessity has to be a State agency”
 
 (Whalen v Wagner,
 
 4 NY2d 575, 584;
 
 see also, Trippe v Port of N. Y. Auth.,
 
 14 NY2d 119, 123; McKinneys Uncons Laws of NY § 6610). Further, some of the disputed documents overtly bear significations that they are confidential communications, “restricted” and “contain [ing] sensitive information” that should be released only on a “need to know” basis. Most of the documents also indicate that they were prepared by the OSP, were circulated among OSP employees, or were prepared by private consultants and directed to the OSP for its evaluation of the WTC complex. The consultants’ documents bear such titles as “Vulnerability Study * * * For the World Trade Center Complex” and “Physical Security Review of the World Trade Center.” On their face and by their evident nature, the disputed documents measure up to the minimum qualifications of
 
 Cirale
 
 for the privilege to be recognized and to become potentially available. The categorical exclusion of the privilege by the Appellate Division, thus, misses the mark and is erroneous.
 

 On remittal, the range of inquiry includes whether the PA can show that the public interest might be harmed if the sought-after materials were to lose their confidentiality shield, such that, on balance, disclosure might produce results more harmful to the public good than beneficial to the private litigating parties seeking it here. As cogently documented and tracked by the Special Master, the PA offered three reasons for how the public interest might be harmed by disclosure here: (1) the documents, or some of their parts, contain confidential information concerning safety or security systems, methods, devices, practices or vulnerabilities, the disclosure of which would endanger lives and property and adversely affect security at the WTC; (2) the disclosure would inhibit candor among persons engaged in efforts undertaken by government agencies to promote public safety; and (3) the disclosure would reveal confidential information regarding criminal activity obtained from law enforcement agencies under a pledge of confidentiality. These arguments are vital and, arguably, unassailable in view of the stark specter of worldwide terrorism and domestic efforts to deal with these growing threats to highly visible public targets of terrorist opportunism
 
 (see,
 
 Note,
 
 Landowner Liability for Terrorist Acts,
 
 47 Case W Res L Rev 155 [1996]).
 

 Plaintiffs counter that a just adjudication, as they see it, of their negligence claims could also contribute to public safety
 
 *11
 
 more directly than any potential harm flowing from disclosure. They assert that, if the PA was negligent or reckless, money judgments might serve as a meaningful deterrent against future negligence on the part of the PA and other similarly situated landlords. Further, successful resolution of their claims could also serve as an incentive for all landlords to implement security measures reasonably necessary to deter terrorists or similar tragedies in the future.
 

 Plaintiffs’ heavily emphasized objection to the interposition of the public interest privilege is that the PA, in its role as the landlord managing and operating the WTC, is gathering and analyzing security-related information just as a typical private landlord seeks to protect the security of its tenants and property. Plaintiffs here assert that because private landlords must engage in this function without the benefit of a special immunity against ordinary discovery overtures and entitlements, the PA should not be able to wrap itself and its WTC operations within the public interest cloak.
 

 However, the mere fact that private landlords also operate and manage other large buildings in Manhattan or elsewhere does not dissolve the essence of this privilege, which may be available to the PA’s security-related documents. The public interest privilege was not crafted to apply to private landlords
 
 (see, id.,
 
 at 192), and we need not address the issue of whether the privilege should be absolutely precluded under similar circumstances where private landlords are involved. This case does not represent some slippery slope or opportunity to expand the doctrine. It is enough to decide only that the privilege may apply to the PA, or, at least, is not precluded as a matter of law. Thus, the questions generated for remittal and the augmented intermediate appellate court review include how far and to which documents the privilege should apply in the context and with the benefit of the explicit findings of the Special Master, as adopted by Supreme Court.
 

 In this regard, we note that the Appellate Division decision was pegged to a distinction between the PA’s “general” functioning as a governmental agency, and its functioning, in connection with this matter, in a nongovernmental capacity
 
 (see,
 
 248 AD2d 137, 137-138). However, the Appellate Division did not sufficiently appreciate or attend to the nuance and subtlety of the continuum of governmental and proprietary functions that may overlap
 
 (see, Miller v State of New York,
 
 62 NY2d 506, 512).
 

 
 *12
 
 The Appellate Division may also have conflated the test for whether the public interest privilege attaches with the standard for determining whether the PA could be immunized from liability as a State agency
 
 (compare, Cirale v 80 Pine St. Corp., supra, with Clinger v New York City Tr. Auth.,
 
 85 NY2d 957,
 
 and Miller v State of New York,
 
 62 NY2d 506,
 
 supra; see also, Clark-Fitzpatrick, Inc. v Long Is. R. R. Co.,
 
 70 NY2d 382). Notably, nothing requires a defendant to establish immunity from liability as a prerequisite to qualifying for an otherwise available privilege at the pretrial discovery stage. The key to deciding this precise issue is the fact-specific balancing assessment promulgated in
 
 Cirale,
 
 which the Appellate Division failed to perform with its matter-of-law elimination of the privilege
 
 (compare, Brady v Ottaway Newspapers,
 
 63 NY2d 1031).
 

 We note that the PA also argues that certain documents, or at least some parts, should be withheld based on irrelevancy grounds. “Of course, if the information sought is in fact privileged, it is not subject to disclosure no matter how strong the showing of need or relevancy”
 
 (Cirale v 80 Pine St. Corp., supra,
 
 at 117). Because the scope of the public interest privilege must be determined before relevancy issues are even considered, this Court need not and should not now render a matter-of-law relevancy ruling.
 

 Additionally, plaintiffs urge that the requirement of a confidentiality agreement should mitigate the PA’s concerns and essentially eliminate the PA’s need to press the public interest privilege. However, if a privilege applies, the documents simply need not be produced. A confidentiality agreement is not a legally cognizable substitute for a legitimately asserted public interest privilege.
 

 In conclusion, both sides seem to propose widely polarized positions. We reject both a per se privilege for security analyses and any absolute preclusion of its availability to the PA. To put this case into perspective, our resolution pointedly rearticulates
 
 Cirale’s
 
 governing legal principle, and directs its application with modern, intelligent and prudent guideposts keyed to weighing, to the extent possible, a fact-driven balancing of competing interests that is not readily amenable to matter-of-law dictates.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the matter remitted to the Appellate Division for further proceedings in accordance with this
 
 *13
 
 opinion, and the certified question should be answered in the negative.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 Order reversed, etc.